**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**SUSAN ANN SHOULDERS,**

Plaintiff**,**

v.

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

Defendant.

**CIVIL ACTION NO.: 2:17-CV-13**
**(BAILEY)**

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On February 17, 2017, Plaintiff Susan Ann Shoulders ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).   On April 26, 2017, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant  United  States  Attorney,  filed  an  answer  and  the  administrative  record  of  the proceedings.   (Answer, ECF No. 6; Admin. R., ECF No. 7). On May 25, 2017, and June 30, 2017, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13).   Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

On January 22, 2013, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on August 17, 2011. (R. 181).  Plaintiff's earnings record has no date last insured listed (R. 194).  This claim was initially denied on July 31, 2013 (R. 112) and denied again upon reconsideration on November 13, 2013 (R. 120).  On January 3, 2014, Plaintiff filed a written request for a hearing (R. 123), which was held before United States Administrative Law Judge ("ALJ") Karen Kostol on June 17, 2015 in Morgantown, West Virginia. (R. 31-72).  Plaintiff, represented by Ambria Adkins at the hearing, appeared and testified, as did Casey Vass, an impartial vocational expert. (Id.). On July 2, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 15-25). On December 21, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-4).

## III.   <u>BACKGROUND</u>

### A.   Personal History

Plaintiff was born on January 27, 1964, was forty-nine (49) years old when she filed her claim (R. 181), and fifty-one (51) years old at the time of the hearing. (R. 40). She completed eleventh grade, and never obtained a GED; Plaintiff further testified that she was in special education classes for the duration of her schooling. (R. 42). Plaintiff's prior work experience included video attendant, telemarketer, waitress, and short order cook. (R. 24). She was divorced at the time she filed her initial claim (R. 181) and was divorced at the time of the administrative hearing. (R. 33). She has four children, none of whom are dependent or live with her. (R. 222,

696). Plaintiff alleges disability based on major depressive disorder (severe with psychotic features), generalized anxiety disorder, polyneuropathy, memory impairment, chronic lower extremity edema, peripheral arterial disease, partial amputation of second and third left toes, and exogenous obesity. (R. 289).

**B.      Relevant Medical History**

At issue on appeal is the ALJ's treatment of psychological evidence; no arguments are raised as to Plaintiff's physical conditions or limitations. Accordingly, review of evidence is limited to psychological evidence only for relevance and brevity.

**1.   Medical History Post-Dating Alleged Onset Date of August 17, 2011**

Plaintiff began receiving mental health treatment from Community Mental Health Center ("CMHC" - Upshur County) in July of 2013. (R. 681). At her initial intake assessment, Plaintiff reported that she was "seeking treatment for depression." (R. 681). Plaintiff was referred for mental health treatment by her primary care doctor; she noted that "[h]er family physician has prescribed her anti-depressant medication," but she had never attended therapy. Id. At that appointment, it was noted that "Susan experiences moderate to severe depressive symptoms daily." Id. Plaintiff reported that she "does not return phone calls and has no desire to spend time with other friends or family members." Id. Although she "used to make an effort to spend time with her grandchildren, [] she has not seen [them] in several months." Id. She has also not visited her son, who is institutionalized "in the State hospital" as a result of schizophrenia, in several months. (R. 682). She reported "that she could be verbally aggressive," and as a result, she tried to avoid "situations that she knew would turn volatile." Id.

At this intake appointment, Plaintiff appeared "somewhat disheveled," but she was clean and appropriately dressed. (R. 683). She reported being unable to sit still. Id. Plaintiff was

cooperative and communicative, and appeared to be relaxed. Id. Plaintiff's speech was observed to be "slow," and she appeared to have "a hard time recalling events." (R. 683). Her mood was observed as "depressed and irritable," and her affect "flat." Id. She reported significant problems with concentration and being "quite forgetful." Id. Plaintiff reported experiencing both auditory and visual hallucinations. Id. Plaintiff's insight and judgment were deemed "fair." Id. She reported suicidal ideations three to five (3-5) times per week, but denied any plans or means to follow through with them. Id.

On September 17, 2013, Plaintiff was seen for a psychiatric intake evaluation at United Summit Center by Linda McPherson ("USC" – Buckhannon). (R. 694). Plaintiff stated "I just can't stand being around people." Id. She reported that her moods worsened after her mother's death in 2009, around which time she also got divorced - there was "a lot of drama going on at th[at] time." Id. She reported that she would just "rather sleep" – sometimes all night and all day the next day. Id. She "doesn't want to be bothered," does not want to talk on the phone, and does not like to be around anyone. Id. "Things are getting progressively worse." Id. Plaintiff continued to report passive suicidal thoughts. Id. She reported feeling hopeless and useless. Id. She noted a family history of mental conditions, including her mother (schizophrenic), son (schizophrenic, bipolar, mood disorder), her daughter (attempted suicide), and her other son (suicidal and homicidal). Id. Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe, with psychotic features, and assigned a Global Assessment of Functioning ("GAF") score of 50. (R. 695). Plaintiff was directed to continue taking Prozac, discontinue Paxil, take Tegretol, and do therapy. Id.

On December 3, 2013, Opal Fox with CMHC completed a mental status assessment. Plaintiff was dressed appropriately with good hygiene, cooperative, and maintained good eye

contact. (R. 692). Speech and thought processes were normal. Id. Plaintiff's affect was normal and her mood congruent. Id. Although Plaintiff admitted having auditory hallucinations, she did not appear to be having any hallucinations at that time. Id. She denied having any delusions. Id. Plaintiff complained again of memory problems, though Fox noted both appeared to be intact during the interview. Id.  Fox also administered the Adult Functional Assessment and Plaintiff's scores were as follows (R. 692): Domain I – mild self care dysfunction (R. 685); Domain II – moderate dysfunction; Domain III – moderate social, interpersonal, and family dysfunction (R. 685); Domain IV – marked concentration and task performance dysfunction, moderate hallucinations, moderate poor concentration, moderately suspicious (R. 684); and Domain V – mild maladaptive, dangerous, and impulsive behaviors dysfunction. (R. 685).

Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features, and a GAF score of 50. Id. By the next review scheduled for March 2014, the treatment plan listed the following outcome objectives: Plaintiff will 1) "reduce her moderate symptoms of hallucinations, poor concentration and suspiciousness as evidenced by the Comprehensive Clinical Assessment to a targeting rating of mild or not present;" (R. 684); 2) "reduce her severe symptoms of agitation as evidenced by the Comprehensive Clinical Assessment to a targeted rating of moderate or mild," (R. 685); and 3) "reduce her mild symptoms of suicidal ideations as evidenced by the Comprehensive Clinical Assessment to a targeting rating of not present." (R. 686).

Plaintiff's case manager referred her for an evaluation because Plaintiff had "been experiencing a significant level of symptoms and expressed concern over her diagnosis due to family history of mental illness and medication inefficacy." (R. 696). On February 10, 2014, psychologists Laura Wilson, M.A. and Dennis Kojaza, Ph.D. completed a psychological

evaluation of Plaintiff at USC. Id. Wilson reviewed Plaintiff's chart, conducted a clinical interview and mental status examination, and administered the Weschler Abbreviated Scale of Intelligence (WASI-II) and the Minnesota Multiphasic Personality Inventory (MMPI-2). Id.

In the clinical interview, Plaintiff again reported a worsening of her symptoms following her mother's death in 2009. (R. 697). She reported having "difficulty interacting with others and can become verbally abusive towards them." Id. She reported that she "remains isolated at home so that she does not have to interact with others." Id. She reported having "to be prompted to take showers and to leave [her] home." Id. She complained of memory problems and complained that tasks took "longer than they should, either because she gets off track or because she does not care to complete them." Id. She reported being "easily frustrated with everything" and experiencing "rapid mood changes where she will be happy and then snap to anger." Id. She reported sleeping much of the day, and prefers being asleep to being awake. Id. "[A]t time she feels as though someone is talking to her and she is answering . . . she hears voices in her head and it feels as though she is telling herself a story and prompting her throughout the day." Id.

As to the mental status assessment, Wilson noted that Plaintiff was clean and dressed appropriately. (R. 698). She was cooperative, and motor skills appeared intact. Id. Plaintiff "presented with depression and some irritability," described her mood as "sad," and evidenced an "average" range of emotional expression. Id. Speech was normal; Plaintiff was appropriately oriented. Id. Although immediate memory was intact, "delayed" memory was "impaired as evidenced by her ability to only recall one of the four items previously presented after a short delay." Id. Plaintiff also had "some difficulty" providing specific details about her personal history, indicative of remote memory issues. Id. Insight and judgment were deemed "fair." Id. Plaintiff again reported passive suicidal thought with no plan or intent. Id.

As to the WASI, Wilson noted that although Plaintiff's IQ scores were "Borderline" or "Extremely Low," that was "not likely truly representative of Susan's intellectual ability, as she exhibited some resistance towards clarifying answers on certain subtests and admitted that she often becomes easily frustrated with tasks." (R. 698).

As to the MMPI-2, Wilson noted that Plaintiff's "MMPI-2 profile was invalid due to significantly elevated validity scales." (R. 699).  "Possible explanations for her high response rate (on the deviant scale items) include: reading problems, a plea for immediate help for significant symptoms, and to derive secondary gains." Id. Wilson was able to eliminate one of those options – reading problems – because Plaintiff's "functional abilities and scores on the VRIN and TRIN validity scales rule out reading problems as a contributing factor." Wilson did not eliminate either of the two remaining possible explanations for the invalidity of the MMPI-2 results. Id. Wilson also observed that regardless of the issues with the *personality* inventory (MMPI), she believed that Plaintiff nonetheless "[wa]s likely experiencing a significant level of *depression*." Id. (emphasis added). Like consultative examiner Morgan, Wilson also noted that Plaintiff's "history of tumultuous relationships and aggressive interpersonal skills may be a result of a specific personality disorder that is not evident at this time." (R. 699-70). Wilson also noted that Plaintiff's "symptoms of consistent sadness, irritability, loss of interest, self-neglect, fleeing suicidal ideation, and concentration problems support" the Major Depressive Disorder diagnosis (severe) Plaintiff was regularly assigned. (R. 699). Wilson recommended that Plaintiff continue medication management and could also benefit from individual therapy to address angry outbursts. (R. 700).

At a review assessment at CMHC on March 26, 2014, Plaintiff continued to report "mild suicidal thoughts and stated that she does not 'want to be in this world anymore.'" (R. 687). She

reported that she and her boyfriend broke up "because she always 'snapped' at him." Id. She complained of frequent mood swings and not sleeping much at night. Id. She reported not feeling like doing much lately, having no energy, and needed to be told to take a shower. Id. She reported anxiety and "picking at her fingernails due to [the anxiety]." Id. She does not like being around people and stated she would like "to run away to Utah." Id. She continued to experience suicidal thoughts with no plan or intent. She continued to experience suicidal thoughts with no plan or intent. Id. Her diagnosis of Major Depressive Disorder, recurrent, severe, with psychotic features – "as evidenced by her suicidal ideations, withdrawal, impulsivity, verbal aggression, hallucinations, poor concentration, suspiciousness, depression, guilt, anxiety, hopelessness, agitations, hyperactivity, distractibility, loss of interest, change in appetite and sleep difficulties." (R. 688). She was assigned a GAF score of 50. Id.

Plaintiff began treating at Bridgeport Behavioral with Dr. Salman in May of 2014. (R. 820). Her intake evaluation noted chief complaints were depression and anxiety since 2004 and worsening over the years. Id. She complained of difficulty remembering things, irritability ("'snaps' at people"), racing thoughts, insomnia, mood swings, crying spells, and paranoia ("always feels like people are talking about her."). Id. Plaintiff was oriented, her speech was clear, and hallucinations was marked "? Unsure." Id. Mood was described as "okay," and affect was reactive. Id. Occasional passive suicidal ideations were noted. Id. A GAF score of 45 was assigned. (Axis V). Id.

Subsequent visits spanning June 2014 – May 2015 continue to document the same – repeated complaints of poor sleep, feeling emotional, mood swings, crying spells, and racing thoughts. Though Plaintiff was generally cooperative, had good eye contact, and clear speech, she also regularly evidenced a depressed or anxious mood and labile or blunted affect, and

delusions or hallucinations were sometimes noted. On July 30, 2014 Plaintiff reported that she "no longer feels like jumping out of [her] skin," but "still [was] not [doing] good," and continued to complain of racing thoughts, and feeling depressed and hopeless. (R. 817). In August 2014 she complained of mood swings and feeling emotional (reporting she would cry when watching television). (R. 816). In October 2014 Plaintiff again complained of mood swings and feeling emotional; she was frustrated with weight gain and her medication, and wanted Risperdal switched to something else. (R. 815).

On January 13, 2015, Plaintiff "admit[ted] that she continues to feel easily provoked [and] irritated," experienced anxiety attacks, and reported a confrontation in which she felt "agitated" and "got in in [a] man's face and yelled at him." (R. 814). In February 2015 she reported sleeping better, but in terms of moods and behaviors she was "about the same . . . irritated by 'people' in general, mood swings . . . paranoia [she felt like people are talking about her], racing thoughts," feeling isolated and withdrawn, and still "snapping quickly at family and friends." (R. 813). By March 2015 her sleep was worse again, and her "mood swings and anxiety [we]re continuing problems." (R. 812). In April 2015 Plaintiff was "not feeling good" and continued to feel depressed and have mood swings, and reported that she "feels more anxious lately." (R. 811). On May 1, 2015, Plaintiff reported visual hallucinations ("having a vivid vision of her son and the police coming in"), feeling overwhelmed, and continued mood swings. (R. 810). On May 29, 2015, Plaintiff reported improvement in her restless leg syndrome, but her sleep was still "poor," she was still irritable. (R. 809).

### 2. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

##### i. *Mental Limitations*

On July 8, 2013, agency reviewer Jim Capage, Ph.D. reviewed Plaintiff's records, evaluated listings 12.04 (affective disorders and 12.06 (anxiety disorders), and completed a psychiatric review technique ("PRT") and Mental Residual Functional Capacity ("MRFC") assessment. (R. 78). In his PRT, Capage found mild limitations of Plaintiff's activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (R. 79). As to sustained concentration and persistence limitations, Capage found Plaintiff had moderate limitations in her ability to 1) carry out detailed instructions, 2) maintain attention and concentration for extended periods, 3) work in coordination with or in proximity to others without being distracted by them, and 4) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 81-82). As to social interaction limitations, Capage found Plaintiff was moderately limited in the ability to 1) accept instructions and respond appropriate to criticism from supervisors, and 2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Id. (R. 82). As to adaptation limitations, Capage answered "Yes" to the question, "Does the individual have adaptation limitations?" but went on to list that Plaintiff was "not significantly limited" or had "no evidence of limitation" in each category of adaptive limitations. Id. Capage added that Plaintiff's "impairments are severe, but do not meet nor equal these listings," (R. 78), and that:

> MRFC assessment indicates that the [Plaintiff] can learn and perform at least routine 2-3 step work-related activities. Tasks should be low stress with no fast-paced production quotas, no supervisory responsibilities, and no complex decision making. She can sustain basic work interactions, but is best suited to work at tasks that do not require cooperative endeavors in a setting that calls for no more than occasional and superficial social interaction.

(R. 82-83). Plaintiff was found partially credible as to her mental complaints because her "statements concerning her [symptoms] and related functional limitations appear to exceed that

supported by the [medical evidence of record] and are deemed not fully credible." (R. 79). Under

"Weighing of Opinion Evidence," the determination stated "[t]here is no indication that there is

medical or other opinion evidence" (R. 79); and under "Reconciling of Source Opinion," "[t]here

is no indication that there is opinion evidence from any source." (R. 83).

### b. *Disability Determination at the Reconsideration Level*

Plaintiff's disability determination at reconsideration indicated additional psychological

records dated July 8, 2013 and September 17, 2013. (R. 91). On October 30, 2013, agency

reviewer Ann Logan, Ph.D. reviewed the prior PRT and MFRC assessments and affirmed them.

(R. 93). Logan noted only that the "[n]ew evidence [was] received and reviewed. No change in

assessment." Id.

### c. **Consultative Examination – Mental Assessment**

On June 29, 2013, Morgan D. Morgan, M.A. completed a consultative mental assessment

of Plaintiff at the Commissioner's request, including a mental status examination and clinical

interview. (R. 505). Morgan noted that he reviewed records from the Tri-County Health Clinic,

Southern Upshur County, and United Hospital Center. (R. 506). Morgan recounted Plaintiff's

subjective complaints as follows:

> SUBJECTIVE SYMPTOMS: The client reported history of recurrent depressive
> episodes. She described her current mood as typically depressed. She reported problems
> with attention, concentration, and recall. The client reportedly frustrates easily and
> displays irritability. She reported symptoms of anhedonia, as well as a diminished libido.
> She reported guilt feelings. She is an anxious individual who readily ruminates over
> problems. She sometimes feels restless and apprehensive. The client reportedly paces or
> picks at her nails. She has a history of poor anger control. Relationships have often been
> highly tempestuous and problematic. Her sleep is reportedly disturbed. Her appetite is
> diminished. She has been losing weight. The client reported occasional crying spells. Her
> energy level is diminished. She denied any past suicide attempts or any current plan of
> suicide. She denied a history of mania, PTSD, or psychosis.

(R. 505-06). Objective symptoms observed by Morgan included that Plaintiff appeared "somewhat tense" and "somewhat irritated" at times, with restricted affect. (R. 508). Her mood was dysphoric and occasionally anxious. Id. Morgan also noted that Plaintiff was cooperative and compliant, and her eye contact was good, with no abnormalities noted as to posture or gait. (R. 507). Speech and verbal responses were within normal limits. Id. Morgan noted that Plaintiff was oriented to time, name, and place, but was uncertain of the date. Id. Plaintiff's insight was mildly deficient; her judgment was within normal limits. Id. Plaintiff's immediate and remote memory were mildly deficient, based on results of recall tests. (R. 507-08). Plaintiff's recent memory was moderately deficient. (R. 509). Her social functioning was moderately deficient, based upon the assessment. Id. Her concentration was moderately deficient, based on the Digit Span subtest of the WAIS-IV. (R. 508). Persistence was deemed mildly deficient, based upon presentation. (R. 509).

Morgan diagnosed Major Depressive Disorder, recurrent, moderate; Generalized Anxiety Disorder, and "probable Personality Disorder" with a history of Borderline Personality features. (R. 508). Social functioning was deemed moderately deficient, based on the results of Morgan's assessment. (R. 509). Morgan opined that Plaintiff's prognosis was "poor." (R. 508).

### d. Verification of Disability Form

Primarily at issue here, on November 11, 2014, Dr. Salman completed a Verification of Disability form for Plaintiff pursuant to an application for her to reside at Weston Arbors, subsidized housing for the elderly and disabled. (R. 821-823). Unlike a Medical Source Statement form as is typically completed by treating physicians for the Commissioner, this "check box"-style form solicited only a few basic questions. (R. 822). Dr. Salman checked "Yes" to indicate that Plaintiff had "a disability, as defined in 42 U.S.C. 423, which means [an]

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that . . . has lasted or can be expected to last for a continuous period of not less than 12 months." Id. He also checked "Yes" to indicate that Plaintiff had "a physical, mental, or emotional impairment that is expected to be on long-continued and indefinite duration." Id. This form did not solicit or provide any space for the completing physician to indicate functional limitations or explain his answers to the checkbox questions, noting that information requested included "only the minimum information necessary to determine whether you meet the applicable definition of disability . . . Any other request for information about you is not relevant and may not be asked (e.g., diagnosis, treatment plan). (R. 823).

C.    **Testimonial Evidence**

At the ALJ hearing held on June 17, 2015, Plaintiff testified that she was divorced and lived alone. (R. 41). She received food stamps and a medical card. (R. 43).

She worked in 2011 for a month or two at Jane Lew Trucking; she left that job because she felt the people around her were talking about her, and she could not handle the pace. (R. 45). She worked at the sports grill from November to February of 2011. Id. She occasionally cooked and waitressed at this job, but the majority of the time, she handled the video game machines. (R. 49). She testified that she had to count money and pay out money to customers, and "made a lot of mistakes." Id. She left that job because her manager yelled at her, though she also had problems with stress, anxiety and sitting still with that job. (R. 46). Plaintiff worked for Crestview Manor Nursing and Rehab doing housekeeping. (R. 47). She quit after two weeks, again because she "couldn't handle the people." Id. Plaintiff worked for the Tele Response Center doing telemarketing for a number of years. Id.

The ALJ asked Plaintiff what conditions she had the led her to believe she could not work. Plaintiff testified that she "wouldn't be able to remember" or operate a register any longer, and cannot stay focused for long. (R. 51).  She also finds it difficult to stay in one place and has to walk constantly. Id. Moreover, she cannot be around people as she cries a lot and "snap[s] real easy." Id.

Plaintiff's attorney then questioned Plaintiff further about her impairments. Plaintiff testified that after her toes were amputated, she has difficulty staying balanced, both when walking or standing still. (R. 52). She does not use any assistive devices to walk. Id. She testified that when she has trouble with her balance, "people make fun of [her] because [she] look[s] like [she is] drunk," and sometimes staggers. (R. 53). She continues to have problems with edema (swelling) in her legs, which she notices "at least once a day." Id. She takes Lasix for that, which her doctors took her off for a few months due to complications with her kidneys, but she was subsequently put back on. (R. 54). She testified that the Lasix was helping some, but she still has to prop her legs up every night and sometimes during the day due to the swelling. Id. Plaintiff testified that her kidneys were being monitored and checked every six months. (R. 55). She is also having visual hallucinations "a few times a month," for which her dosage of Abilify was recently increased. Id.

As to mental health treatment, Plaintiff testified she has seen Dr. Salman monthly for the past year for psychological issues and also sees a therapist named Amy at the same office. (R. 56, 58). Prior to that, she was receiving counseling at United Summit Center with Opal Fox. (R 56). Dr. Andrews also prescribed her Prozac as well. Id. Plaintiff currently lives in housing for senior citizens or the disabled. Id. Although she did not meet the age requirements, she was able to obtain housing there pursuant to a statement from Dr. Salman that she was disabled. (R. 58).

As to daily activities, Plaintiff testified that she rarely sees or talks to her friend Faye any more. (R. 59). Now, her daughter goes to the store with her approximately once a week, as she "do[es not] like the people." Id. Plaintiff also goes out to the grocery store by herself when she can borrow her daughter's car. (R. 60). She also goes for walks on her own, to the store and back. Id. When Plaintiff goes to Walmart by herself, she cannot stay very long because she gets upset easily by the people there. (R. 61). She has problems sleeping and takes a sleeping aid, but still wakes up through the night and her mind races for "about an hour." Id. During the day, Plaintiff testified that she spends some time with a friend or watches television, though she "zone[s out]" and cannot focus on what she is watching. (R. 62). She does do some reading, and although she can read, she has problems concentrating on what she is reading and loses her place. Id. She tries to knit a blanket but it is taking a long time because she can typically work on it for about half an hour before she stops. (R. 63).

Plaintiff does not have problems lifting and carrying things, but does have problems sitting for an extended period of time. (R. 63). She was prescribed medication to "make [her] more relaxed" that helps her sit longer. (R. 63-64). She can walk for about ten (10) minutes in one direction and ten (10) minutes back. (R. 64). How long she can stand "depends; [her] toes don't hit flat . . . so [she] fluctuates on [her] standing." Id. For that reason, she cannot stand "even 20 minutes in one place." Id.

**D.    Vocational Evidence**

Also testifying at the hearing was Casey Vass, a vocational expert ("VE").  VE Vass characterized Plaintiff's past work as:

    1.    Video Attendant, DOT Code 342.667-014, unskilled, light work with a
          specific vocational preparation ("SVP") of two (2); (R. 66).

     2.     Telemarketer, DOT Code 299.357-014, semi-skilled sedentary work with an SVP of three (3); <u>Id.</u>

     3.     Waitress, DOT Code 311.477-030, semi-skilled light work with an SVP of three (3); <u>Id.</u>, and

     4.     Short Order Cook, DOT Code 313.374-014, semi-skilled light work with an SVP of three (3). (R. 67).

VE Vass clarified that the video attendant, waitress, and short order cook work was a combination job. <u>Id.</u>

With regards to Plaintiff's ability to return to her prior work, VE Vass gave the following responses to the ALJ's hypothetical:

> Q     I ask that you assume an individual with the same, age, education and past work experience as the claimant with the following abilities. There are no exertional limitation in this case. Said individual is capable of simple, routine, and repetitive tasks in a low stress job, defined as having only occasional decision making required, and occasional changes in the work setting and no strict production quotas. Said individual is capable of occasional interaction with the general public, co-workers and supervisors. Can an individual with these limitations perform any of the claimant's past work?
>
> A     That's out. That's out. That's out. Would only be the - - [INAUDIBLE] No.

(R. 67). Incorporating the above hypothetical, the ALJ then questioned VE Vass regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels:

> Q     Okay. Is there other work this individual can perform?
>
> A     No exertion -- yeah, heavy, unskilled jobs?
>
> Q     Yes.
>
> A     I would list a laborer. DOT number is 914.687-010, 94,000 jobs in the nation; 1,400 in the region. A lumber handler. The DOT code is 922.687-070, 245,000 jobs in the nation; 6,200 in the region. Bakery worker. The DOT code is 520.585-010, 123,800 in the nation; 3,700 in the region. These are unskilled, heavy jobs.

(R. 68). Finally, the ALJ questioned VE Vass about Plaintiff's ability to work if she is completely credible as to the severity of her condition:

Q     Now, the second hypothetical. If you add a limitation that said individual is capable than no more than medium exertional level work. Can never climb ladders, ropes or scaffolds. Can occasionally climb ramps or stairs, and occasionally balance. Also, said individual must avoid concentrated exposure to any hazards. Would those jobs that you stated remain available?

A     No.

Q     Would there be other jobs this individual could perform?

A     A laundry worker, DOT code is 361.685-014, 98,500 jobs in the nation; 2,700 in the region. A farm worker, the DOT code is 402.687-010, 238,000 jobs in the nation; 4,700 in the region. A kitchen worker, the DOT code is 318.687-010, 480,000 jobs in the nation; 15,800 in the region. These are unskilled, medium jobs.

Q     And at the light exertional level with all of the limitations previously given, what jobs would be available?

A     Assembler, DOT code is 729.684-046, 180,000 in the nation; 4,900 in the region.

A     Hand packer, DOT code is 559.687-074, 310,000 in the nation; 8,100 in the region. A mail clerk, DOT code is 209.687-026, 120,000 in the nation; 3,700 in the region. These are unskilled, light jobs.

Q     And if you assume the same individual and limitations as described in the first -- in the most recent hypothetical, the light hypothetical, with the additional limitation that said individual must be afforded the opportunity for brief, one to two minute changes of position at intervals not to exceed one hour, without being off task. Would there be jobs -- would those jobs remain available for the individual?

A     Yes.

Q     And at the sedentary exertional level with all of the limitations previously given, would there be jobs available for this individual?

A     A surveillance system monitor, the DOT code is 379.367- 010, 79,000 jobs in the nation; 1,800 in the region. Product inspector, DOT code is 669.687-014, 91,700 jobs in the nation; 1,900 in the region. And a small parts assembler, the DOT code is 713.687-018. In the nation there are 230,000 jobs; 3,300 jobs in the region. Unskilled -- these are unskilled, sedentary jobs.

(R. 68-69).

Q     Would the claimant have skills from her past work that would transfer into the sedentary, residual functional capacity given?

A     No.

Q     And if the individual were off task, or to miss work 20 percent of the work week, or greater, would there be jobs available for this individual?

A     No.

Q     How much time off task do most employers tolerate?

A     Two percent at the workstation.

Q     Is your testimony consistent with the information contained in the DOT and the SCO?

A     DOT would not address the off task, the brief change of position. Other than that,

it is.

(R. 70). Plaintiff's attorney questioned VE Vass when provided the chance:

> Q      Mr. Vass, regarding the jobs you've listed and I'm just going to say, each level, at the heavy, medium, light and sedentary level. If the hypothetical person needed time periods throughout the work day at 15 minute intervals to prop their legs up to waist level, would they be able to do that in those jobs?
>
> A      No. There'd be no jobs.
>
> Q      . . . And if the hypothetical person were limited to no interaction with co-workers And only superficial interaction with supervisors, could the jobs listed be performed?
>
> A      Superficial? I would eliminate the -- I would eliminate, I think, heavy and medium jobs. I would eliminate the mail clerk under light, and I would keep the other – remaining jobs.

(R. 70-71).

**E.      Disability Reports and Work History Reports**

On a Disability Report form dated March 7, 2013, Plaintiff listed her disabling conditions as depression and anxiety, which caused her pain or other symptoms. (R. 198). Plaintiff indicated she stopped working on February 1, 2012 due to her conditions.  Id. Plaintiff indicated at that time she was taking Gapabentin for phantom pain, iron for anemia, Norvasc for high blood pressure, Paxil for depression, and Vitamin D for a deficiency. (R. 200). She reported being treated at Family Medicine Center in 2013 for OB/GYN checkup (R. 201); Tri County Health Clinic beginning in 2004 for primary care (R. 202); and United Hospital Center beginning in December 2012 for high blood pressure, kidney failure, and transfusions (R. 203).

On a second Disability Report form dated September 7, 2013, Plaintiff reported that her depression had gotten worse around July of 2013. (R. 231). She reported sleeping more, and avoiding being "around people or [she] will lose it." Id. Plaintiff elaborated that "I feel I am not able to work because I am depressed, moody, very ?, cannot sit still or stand, balance is off. Med[s] are not working." (R. 234). In a third Disability Report form, Plaintiff reported being

"more depressed, eas[il]y distracted, don't want to be around people, can't remember, easily agitated, a lot of anxiety." (R. 246). She reported taking Norvasc for high blood pressure, Prozac for depression, and Tegretol for moods. (R. 248). She reported needing to be reminded to eat and bathe, as she did not want to do anything. (R. 249).

Plaintiff's medications included Lamotrigine for "mood, depression, memory loss, etc.," Ability for anxiety, Topamate to "help lo[se] weight," Zolpidem for sleep, Lorazepam for nerves, Furosemide for fluid retention, Tizandine for muscle spasms, Lovaza, Amlodipine and Lasartan Potassium for blood pressure, Simvastatin and Zetia for cholesterol, Profair HFA for breathing, Roprinirole for restless leg syndrome. (R. 285-8).

Plaintiff reported having worked from November 2011 to February 2012 as a cashier/cook/video attendant with Visico Lottery, and from 1998-2003 and in 2010 as a telemarketer for Financial Telemarketing. (R. 199).   The cashier position was listed on a subsequent Work History Report form as having been with Quiet Dell Sport Grille, where she worked seven (7) hours per day, five (5) days per week. (R. 2014). Plaintiff reported that she walked, stood, and sat "all day," and used machines, tools, or equipment. Id. Plaintiff reported frequently lifting less than ten pounds. (R. 214). On this same form, Plaintiff indicated that she had briefly worked at Jane Lew Nursing home in September of 2011, where she did housekeeping, cleaning, and mopping, eight (8) hours per day, five (5) days per week. (R. 215). She walked and stood eight hours per day, and lifted a mop bucket – ten pounds, frequently. (R. 215). Plaintiff also reported having worked at Jane Lew Truck Stop from June 2011 to August 2011 as a dish washer, for six (6) hours per day, five (5) days per week. (R. 216). She used machines, tools, or equipment at this job, and walked or stood for six hours per day. Id. She frequently lifted ten pounds, loading and unloading the dishwasher. Id. Plaintiff worked as Direct

19

Response at TSR from January 2010 to October of 2010, where she "s[a]t and sold on [the] phone." (R. 217). Plaintiff started out as full time – eight (8) hours per day, five (5) days per week – and later went to part time because she "can not sit still [and] was not allow[ed] to stand." Id. She also worked at TSR from September 1998 to February 2003 doing teleresponse ("sold and talk on phone" [sic]), eight (8) hours per day, five (5) hours per week, before her conditions. (R. 218). In this job, she used machines, tools, or equipment, and marked that she stood at this job, but did not indicate for how many hours per day. Id.

**F.   Lifestyle Evidence**

On an undated adult function report, which appears to have been around September 2013, Plaintiff stated that her illnesses and conditions limited her ability to work in that:

> Being around other people, just want to get away from them, don't want to hurt them, also can't sit very long [as] I get fid[g]ety, [] always have to go to the restroom, and can't stand long [due to] sharp pain in lower back.

(R. 221). As to daily activities, Plaintiff reports that she typically tries to watch television or use the computer, but because she "can't sit, [she] just go[es] and take[s] a nap." (R. 222). She does not care for any other people or animals. Id. Before her conditions, she used to do "normal things" like watching television, talking to friends and family on the phone, and cleaning her house. Id. As to personal care, Plaintiff reported that she gets dressed only if she has to go to the doctor's. Id. She indicated that she does not care much for tending to her hair or shaving. Id. As to feeding herself, Plaintiff wrote only "make my self." Id. She reported no problems using the toilet. Id. Plaintiff reported needing reminders to take care of personal needs and grooming, and to take medications, as well as encouragement to do housework. (R. 223). Plaintiff notes she is able to physically do these things but often goes back to bed. Id. She prepares basic meals such as sandwiches, tv dinners, and soup, as she does not want to cook anymore. Id.

Plaintiff leaves her house to go to doctor's appointments or to the store, which she does once a month. (R. 224). She can drive, but does not have a car. Id. Plaintiff reported being able to pay bills, handle bank accounts, and count change. Id. Her only hobby at that time was watching television "some times," though she cannot do it very well due to problems sitting. (R. 225). She no longer is able to watch a movie for that reason, which she was able to do before. Id. Plaintiff reports she does not spend time with others, as she primarily sleeps and does not visit others. Id. She noted that she does not want to be around anyone, and that she has problems getting along with family, friends, and others as they "get on [her] nerves." (R. 225-26). The same is true of authority figures. (R. 227). In response to whether she had ever been fired or laid off from a job because of problems getting along with other people, Plaintiff marked "No" and wrote, "I quit." Id. She reported not wanting to do anything with people. Id.

Plaintiff reported that her conditions affect her ability to stand, sit, talk, remember things, concentrate, and get along with others. (R. 226). She reported not being able to pay attention for very long. Id. She does not finish what she starts. Id. She tries to follow written and spoken instructions, but forgets what she is doing. Id.

On a second adult function report dated October 15, 2013, Plaintiff generally reported worsening of her existing problems; she was sleeping more, was more depressed and more forgetful, and continued to have difficulty being around others - including her boyfriend. (R. 236-42). She noted that relationships were difficult and she often "[went] silent" around him.  (R. 240). Getting along with others was "very hard[, as she] will bite someone['s] head off." (R. 241). She reported not talking to friends and family as much because she "just wan[s] to be alone if at all – sometime[s she] just [does not] want to be here at all." Id. She was largely reliant on her friend Faye to help her do things. (R. 240). She was having more problems with memory and

greater difficulty following any written or spoken instructions. (R. 241). She reported not handling stress or changes in routine very well, and crying easily. (R. 242).

Plaintiff added that she attempted to work at the Boy Scout bake sale but she "could not handle the people or the stress." (R. 243). She reported that her medications made her sleep if she sat still for very long. Id. She also indicated having problems being with her boyfriend. Id.

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of

the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1.  The claimant has not engaged in substantial gainful activity since January 22, 2013, the application date (20 CFR 416.971 *et seq.).*

2.  The claimant has the following severe impairments: history of partial amputation of left 2nd toe and 3rd toe; chronic kidney disease secondary to residual post acute kidney injury with chronic trace lower extremity edema; obesity; major depressive disorder with psychotic features; and generalized anxiety disorder (20 CF'R 416.920( c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  The undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) that: requires no climbing ladders, ropes or scaffolds and no more than occasionally climbing ramps or stairs or balancing; avoids concentrated exposure to any hazards such as dangerous moving machinery and unprotected heights; is limited to simple, routine, and repetitive tasks in a low stress job, defined as having only occasional decision making required, occasional changes in the work setting and no strict production quotas; and involves no more than occasional interaction with the general public, co-workers, and supervisors.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on January 27, 1964 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 22, 2013, the date the application was filed (20 CFR 416.920(g)).

(R. 15-25).

## VI.   <u>DISCUSSION</u>

### A.   **Standard of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury

verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

However, "[w]e do not reflexively rubber-stamp an ALJ's findings," Lewis v. Berryhill, 858 F.3d 858, *870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, *295-95 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, *235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. Monroe v. Colvin, 826 F.3d 176, *189 (4th Cir. 2016). There are also some things an ALJ may *not* do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at *869. Thus, while an ALJ is not required to discuss *every* piece of evidence, Reid v. Commissioner, 769 F.3d 861, *865 (4th Cir. 2014), an ALJ excludes *relevant* evidence at his peril.

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence when the record as a whole is reviewed by this Court." (Pl.'s Mot. at 1).  Specifically, Plaintiff alleges one issue: that the ALJ "failed to comply with 20 C.F.R. § 416.927 in assigning 'little weight' to the opinion of Plaintiff's treating psychiatrist, Muhammad Salman, M.D." (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 3, ECF No. 10). Plaintiff asks the Court to "enter an order reversing and remanding the Commissioner's decision for an award of benefits, [or in the alternative,] remand in order that the Commissioner may correct the errors made below." (Id. at 9).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that "the ALJ considered the medical source opinions in accordance with the regulations and appropriately determined that Dr. Salman's checkbox opinion was not entitled to controlling weight, and instead was entitled to little weight." (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 8, ECF No. 14).

**C.  Analysis of the Administrative Law Judge's Decision**

The regulations, specifically 20 C.F.R. § 416.927(c), discuss how medical opinions are weighed:

> *How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:

(1) *Examining relationship.*  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give

to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 416.927(c).

The ALJ assigned, in relevant part, little weight to Dr. Salman's opinion due to the length of the treatment relationship, an inconsistency with the evidence of record, and supportability (insufficient explanation):

> Dr. Salman just began treating the claimant in May 2015 and does not have a long treating relationship with her. Further, his opinion of disability is inconsistent with his treatment notes that do not show any significant functional deficits or psychosis (Exhibits 14F and 17F). It is also inconsistent with the consultative examination and her activities of daily living, as noted above. Additionally, the checklist-style form includes only conclusions regarding functional limitations without any rationale for those conclusions, which makes it unpersuasive. The undersigned finds this evidence has no probative value because it is not supported by any objective evidence.

(R. 23).

Plaintiff articulates a number of complaints with regard to the ALJ's assignment of weight for Plaintiff's treating psychological specialist, Dr. Salman, which are reviewed in turn. To summarize, however – it is true that Dr. Salman's opinion, such as it was, leaves much to be desired, and that the lack of a proper opinion with express limitations and supporting rationales has significantly hindered analysis on this point. However, because the majority of the reasons provided by the ALJ in justifying her decision do not hold up to scrutiny, the undersigned is of the opinion that remand for reconsideration and explanation that addresses these gaps is proper. The ALJ's first two reasons for affording less weight to Dr. Salman – length of treatment relationship and lack of functional deficits or psychosis - are invalid and not supported by substantial evidence as they are directly contradicted by the record. The ALJ's rationale as to the remaining three reasons – consistency, activities of daily living, and supportability – are also flawed. As a result, the ALJ's decision cannot be affirmed by the undersigned.

1. **The ALJ failed to comply with 20 C.F.R. § 416.927 in weighing the medical opinion of Plaintiff's treating physician.**

    a. **Length of Treatment Relationship**

Plaintiff argues that the ALJ's first reason – that Salman did "not have a long treatment relationship with [Plaintiff] – is factually incorrect because the ALJ mistakenly believed the treatment began in May of 2015 when it in fact began in May of 2014, a full year earlier. (ECF No. 10 at 8). Defendant argues that this is a mere typographical error on the ALJ's part, one that is "harmless" because the ALJ considered the records which began in May of 2014. (ECF No. 14 at 11). In addition, Defendant argues it is accurate to say that the treatment relationship was not "long," citing no case for this argument. Id.

Even if the ALJ was in fact aware that treatment began in May of 2014 and merely erred in typing May of 2015 - which is the least likely of the possible explanations - that would not resolve the matter. Rather, the question is whether the treatment relationship that began in May of 2014 is properly characterized as "not long" sufficient to support affording less weight on the "length of treatment relationship" factor of the regulations, which provide that:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R. § 416.927(d)(i). It does not.

"[A doctor] who met with [a claimant] three times during the relevant period [] was a treating physician under 20 C.F.R. § 416.927(d)(2)(i)." Shrewsbury v. Chater, 68 F.3d 461, *2 (4th Cir. 1995) (per curiam). A treating mental health specialist who sees a claimant "routinely" – four times in the relevant period, but at least eleven (11) times for 30 minutes or more each visit for two years – evidences a length of treatment relationship that supports, rather than detracts

from, physician's opinion. <u>Pridgen v. Colvin,</u> 2016 WL 4047058, **5**-6, Civil Action No. 4:15-CV-95-F (E.D.N.C. 2016).[1]

Therefore, whether the ALJ was mistaken as to when the treatment relationship began and failed to acknowledge the additional treatment notes dating back to May 2014, or whether the ALJ knew that but still nevertheless characterized the treatment relationship as "not long," she is incorrect either way. Plaintiff's treatment relationship with Dr. Salman was sufficiently long and frequent "enough [for him] to have obtained a longitudinal picture of [her] impairment." 20 C.F.R. § 416.927(d)(2)(i). Therefore, this reason for assigning less weight to Dr. Salman's opinion is not supported by substantial evidence.

### b. Consistency

Consistency is one of the factors an ALJ considers when weighing medical opinions. 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Internal consistency concerns the extent to which a medical source's opinion is consistent with that source's own statements and observations, often in the form of treatment notes. External consistency, on the other hand, concerns the extent to which a medical source's opinion is consistent with other evidence of record, outside the source of the opinion. Plaintiff raises objections to both, addressed in turn.

### i. Internal Consistency

Plaintiff challenges the ALJ's finding of internal inconsistency, arguing that "the ALJ's claim that Dr. Salman's treatment notes did not document functional deficits or psychosis is false [because] Shoulders consistently presented to each office visit with a mood remarkable for depression, anxiety, and lability; a constricted and labile affect; and reports of visual

---

[1] Though the opinion does not specify the dates of each visit, the undersigned notes that eleven visits in two years would approximately equal five or six visits yearly, which Plaintiff here clearly met or exceeded at Bridgeport Behavioral.

hallucinations, sleep disturbances, mood swings, and racing thoughts . . . [in addition, Plaintiff's] mental impairments were not controlled as medication and dosage changes occurred at nearly every single visit." (ECF No. 10 at 6-7). Defendant argues the ALJ properly found that Dr. Salman's opinion that Plaintiff was disabled was inconsistent with his treatment notes which do not reflect any significant functional deficits or psychosis. (ECF No. 14 at 9-10).

Psychotic features are defined in the DSM-5 as those "characterized by delusions, hallucinations, and formal thought disorder."[2] Therefore, the ALJ's claim that treatment notes from Bridgeport Behavioral did not document any psychosis is indeed false, because they clearly did, multiple times. (R. 818) (noting in July of 2014 that Plaintiff was "delusional"); (R. 813) (noting in February 2015 that Plaintiff evidenced paranoia); and (R. 867) (noting in May 2015 that Plaintiff was experiencing visual hallucinations of police coming to talk to her about her son).[3]

As to internal consistency beyond the evidence missed by the ALJ in the record, Salman's opinion here is dissimilar to those treating physicians' opinions found to lack internal consistency in this circuit. A treating physician's opinion as to disability can be internally inconsistent when her testimony is directly contradicted by her own treatment notes. Burch v Apfel, 9 Fed. Appx. 255 (4th Cir. 2001) (Treating physician given little credibility when she testified that 1) Claimant was admitted to the hospital for suicidal thoughts, when her notes clearly indicated Claimant's condition was stable and she was not considered harmful to herself

---

[2] American Psychiatric Association, Diagnostical and Statistical Manual of Mental Disorders (DSM-5) 827 (5th ed. 2013). See also the National Institute of Mental Health, which elaborates that "The word psychosis is used to describe conditions that affect the mind, where there has been some loss of contact with reality . . . Symptoms of psychosis include delusions (false beliefs) and hallucinations (seeing or hearing things that others do not see or hear)." National Institute of Mental Health (NIMH), *What is Psychosis?*, WWW.HIMH.NIH.GOV, https://www.nimh.nih.gov/health/topics/schizophrenia/raise/what-is-psychosis.shtml
[3] Moreover, Dr. Salman was not the only mental health professional to document these findings; others regularly did as well. Though there were occasions on which Plaintiff reported not having hallucinations "*at this time*," e.g., R. 525 (emphasis added), reports of hallucinations were noted in July 2013 (R. 522), December 2013 (R. 670), February 2014 (R. 699) and March 2014 (R. 675).

or others; 2) Claimant's poor response to medication was not her fault, when treatment notes clearly indicated otherwise – "as usual she had not given the medication adequate time to reach some degree of remission;" 3) Claimant's alcohol consumption did not contribute to her failure to recover, when notes indicated Claimant continued to drink against physician's advice and that it was "not beneficial;" and numerous other contradictions and inconsistencies discussed at length by the ALJ). Similarly, a treating physician's opinion was internally inconsistent, support affording less weight when the physician "reported that Plaintiff 'was not . . . abusing illegal drugs . . . [when Plaintiff] testified that she smokes marijuana . . . and when [the treating physician's own] treatment notes indicate that she smoke[s] marijuana occasionally." Rosenthal v. Colvin, Civil Action No. 2:15-CV-41, 2016 WL 881470, *21 (N.D.W.Va. Feb. 19 2016), adopted in 2016 WL 890579 (N.D.W.Va. Mar. 8 2016). There is no issue of this kind to be found in Dr. Salman's notes. Rather, as Plaintiff observes, Dr. Salman's notes reflect that over the course of Plaintiff's treatment at Bridgeport Behavioral, she generally had the same complaints, and overall, despite regular adjustments to her medications, evidenced little improvement. Thus, no inconsistency between Salman's treatment notes and his opinion, such as it was, is apparent to the undersigned, nor has the ALJ explained that conclusion in a way that would permit the court to track her reasoning.

### ii.  External Consistency

Defendant argues that "Dr. Salman's opinion is inconsistent with Dr. Morgan's consultative examination which revealed a dysphoric and somewhat irritated mood, restricted affect with some anxiety, good eye contact, normal speech, no psychosis, mildly deficient insight, normal judgment, no suicidal or homicidal ideation, moderately deficient recent recall, mildly deficient immediate and remote recall, mildly deficient persistence, normal pace, and

moderately deficient concentration and social functioning (Tr. 505-10). See 20 C.F.R. § 416.927(c)." (ECF No. 14 at 10). Defendant further argues that "Dr. Salman's opinion was also inconsistent with the state agency physicians' opinions that Plaintiff was no more than moderately limited in social functioning and concentration, persistence, and pace." (Tr. 78, 92, and 104). Id. Plaintiff argues that despite the Defendant's attempts to justify the ALJ's decision for her, the ALJ herself never specified which parts of the consultative examination were inconsistent with Dr. Salman's opinion. (ECF No. 10 at 8).

The ALJ does not specify how Salman's opinion is inconsistent with Morgan's, leaving the Court to guess as to how he arrived at that conclusion. Fox v. Colvin, 632 Fed.Appx. 750, *755, citing Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) and Radford v. Colvin, 734 F.3d 288, 296 (4th Cir. 2013)) ("Inconsistent evidence abounds, and yet the ALJ 'leaves us to wonder' in such a way that we cannot conduct 'meaningful review.'") It is not apparent; moreover, it is not apparent that the two are particularly at odds.

First, Morgan opined that Plaintiff's prognosis was poor, which indicates he did not consider Plaintiff's prospects for improvement to be good. It is thus not necessarily inconsistent if Plaintiff's treating physician, after having treated her for seven months, found her to be somewhat worse off than did Morgan at a single examination that occurred over a year prior. Nor is it impossible – or even implausible – that a single consultative examination over a year prior was not as representative of Plaintiff's overall and longitudinal functioning as Dr. Salman found Plaintiff to be after treating her for many months. In fact, it is entirely possible, as the Commissioner herself contemplates and directs:

"Longitudinal evidence is extremely important and necessary when evaluating the severity of a mental impairment(s). **A claimant's level of functioning can vary considerably over time. It is vital to obtain evidence from relevant sources over a**

34

> **sufficiently long period prior to the date of adjudication to establish severity and probable duration of the impairment(s).**

POMS DI 0425505.030 (emphasis added). Had the ALJ explained how she considered and weighed all of these factors as to each of the medical opinion sources, as 20 C.F.R. § 414.927 requires, it may have been possible to affirm. Because the ALJ failed to do so, she has frustrated meaningful review on this issue. "While the ALJ's reason for rejecting the treating physician's opinion may be 'good,' the 'cursory and conclusory analysis' provided by the ALJ is insufficient to allow meaningful review by this Court." Fox v. Colvin, 632 F. App'x 750, 756 (4th Cir. 2015).

### c.  Supportability

The ALJ found that Salman's opinion on the housing form "has no probative value because it is not supported by any objective evidence." (R. 23). As a practical matter, it is not clear to the undersigned whether the ALJ meant to say that Salman did not indicate which objective evidence supported his opinion, or whether the ALJ was opining that there *was* no objective evidence in the record that supported such an opinion. If the latter, to say that the opinion is not supported by *any* objective evidence is incorrect.

Although the ALJ makes much of the lack of express functional limitations articulated in Salman's opinion or treatment notes, she fails to address the fact that other longitudinal mental health providers noted functional limitations that are generally consistent with Salman's opinion as to the extent and duration of Plaintiff's limitations, and include both moderate and marked dysfunction. For example, treatment notes from December 3, 2013, list "marked concentration and task performance dysfunction," (R. 684) and "moderate social, interpersonal, and family dysfunction," among other things. (R. 685). At a subsequent visit on March 3, 2014, Plaintiff's social functioning was still moderately dysfunctional, and Plaintiff exhibited "marked concentration and task performance dysfunction, moderate poor concentration" (R. 670).

Moreover, in addition to these specific functional limitations, Plaintiff's Adult Functional Assessment resulted as follows: Domain I – mild self care dysfunction (R. 685); Domain II – moderate dysfunction; Domain III – moderate social, interpersonal, and family dysfunction (R. 685); Domain IV – marked concentration and task performance dysfunction, moderate hallucinations, moderate poor concentration, moderately suspicious (R. 684); and Domain V – mild maladaptive, dangerous, and impulsive behaviors dysfunction. (R. 685).

### d.   Supportability

Defendant argues that the ALJ permissibly discounted the "housing form" due to a lack of supporting explanation, and permissibly found that the housing form had no probative value. The undersigned finds these arguments unpersuasive for a number of reasons. First, the ALJ describes the form as "includ[ing] only conclusions regarding functional limitations without any rationale for those conclusions," rendering it "unpersuasive." More accurately, the form contained two opinions: first, that Plaintiff was disabled under 42 U.S.C. § 423, and second, that her impairments were "expected to be of long-continued and indefinite duration." (R. 822).

In this case, it is important to note at the outset that the "checklist-style form" here is not a medical source statement of the type of this form typically received from treating physicians. Defendant cites Bishop v. Astrue, No. 1:10-2714-TMC, 2012 WL 951775, at *3 n.5 (D.S.C. Mar. 20, 2012), in support of her argument here (ECF No. 14 at 10); yet, the Bishop opinion makes clear that the statement at issue in that case was a "'Medical Source Statement of Ability To Do Work-Related Activities (Physical)' where [the physician] checked boxes regarding Plaintiff's limitations . . . [but failed to respond in narrative form to] the instructions [which] ask[ed him] to identify the factors (i.e. the particular medical signs, laboratory findings, diagnosis, prescribed treatment, expected duration, and prognosis) which support the assessment

of any limitations." Id. at *2.[4] There is no indication in the Bishop opinion that the Medical

Source Statement Form in that case was accompanied by any treatment notes, as the form here

was. Moreover, Bishop concerned whether the Appeals Council erred in denying a request for

review based on a checkbox form unaccompanied by any supporting explanation or (apparently)

treatment notes. As a result, Bishop's utility here is limited to serving as a contrast to Plaintiff's

situation.

Indeed, when accompanied by treatment notes, a checkbox form must at least be

considered in light of any supporting information in those notes.  "While . . . a check-the-box

form, without more, may be discounted, here there was more [in the form of treatment notes],

and it is unclear whether the ALJ considered it." Pridgen v. Colvin, 2016 WL 4047058, *5-6,

(E.D.N.C. Jun. 30, 2016) (contrasting McGlothlen v. Astrue, No. 7:11-CV-148-RJ, 2012 WL

3647411, at *6 (E.D.N.C. Aug. 23, 2012) (unpublished). In addition to Dr. Salman's opinion in

the form as to the extent of the effects of Plaintiff's conditions on her ability to work, the record

also contains his treatment notes. Thus, like in Pridgen, here there is "more." As the ALJ did

consider Salman's treatment notes, however, the remaining issue is whether there is substantial

evidence to support the ALJ's conclusion that Salman's treatment notes do not support the

functional limitations in his form opinion.

On that point, Defendant cites Coleman v. Colvin, 2016 WL 4223583, Civil Action No.

1:15-CV-751 (M.D.N.C. 2016) in support of her argument, in which a *nurse practitioner* – not a

*treating specialist* – completed a checkbox form opinion. However, Coleman too is clearly

distinct from Plaintiff's situation here. In Coleman, there were at least five reasons why the

---

[4] The "check-list style form" here was not from or for the Commissioner, but rather was a brief two-page form for
Plaintiff to receive subsidized housing. There were no such directions; there were in fact only two questions on the
form. Nor is it clear to the undersigned that Salman's opinion as to all of the issues that are contained on the SSA
Medical Source Statement form were solicited, as neither party explains why the record lacks what would appear to
be rather important and helpful information from Dr. Salman.

ALJ's determination that a check box form-style opinion was entitled to no weight was upheld. The first reason was the conclusory form of the opinion, which is also true of Dr. Salman's opinion. The fifth reason was that Wilson's opinion that Coleman was disabled within the meaning of the Act, a matter reserved to the Commissioner. This is also true of Salman's opinion. However, the similarities end here.

The second reason was that Wilson's opinion was "wildly inconsistent" with the remainder of the record, which documents that Coleman's ailments were "essentially stable and well-treated." Id. at *6. The record here, on the other hand, contains a multitude of psychological treatment notes and findings that are generally consistent with Salman's opinion – e.g., notes from USC and CMHC. The third reason was that Wilson's opinion was contradicted by her own treatment notes which described Coleman's various conditions as "doing well," "stable," and "managed" on medication, and Wilson's own physical examinations were unremarkable. Id. In contrast, as Plaintiff points out, the Psychological Progress Notes from Dr. Salman's office document emotional instability and depressed moods at virtually every visit. Moreover, frequent adjustments to her medications did not resolve these issues; nor the poor sleep, racing thoughts, and other symptoms that Plaintiff frequently complained of. The fourth reason was that Coleman's daily activities included "some work activity, walking, exercising, meal preparation, yard work, household chores, and social activities," which contradicted Wilson's opinion that Coleman could only perform a limited range of sedentary work. Id. at *7. Those daily activities are significantly more than Plaintiff here engages in, and her difficulties are primarily mental/emotional in nature, not physical (as were Coleman's). As a result of these numerous and significant distinctions, Coleman does not aid Defendant here.

Rather, when compared to similar cases in this circuit, the correlation between Salman's form opinion and his treatment notes is much stronger than those that have been rejected. For example, in <u>McGlothlen v. Astrue,</u> the court noted that:

> Dr. Serano attached to the form opinion his treatment records dated 15 November 2006 to 4 January 2010 (R. 338–365) and objective findings, including a 5 December 2006 MRI of Claimant's head and cervical spine and a 6 November 2007 nerve conduction study, much of which was discussed by the ALJ. (R. 310–337). In particular, the ALJ noted the following; (1) the MRI showed mild cervical spondylosis and minimal disc degeneration; (2) the nerve conduction study revealed "very mild" right carpal syndrome; (3) Claimant's diagnosis of fibromyalgia; (4) the resolution of Claimant's sleep apnea by Claimant's use of a CPAP machine; and (5) Claimant's treatment for headaches. (R. 15). However, the ALJ found that this evidence does not support the physical limitations noted by Dr. Serano. For example, regarding Claimant's fibromyalgia, the ALJ noted that Dr. Serano's progress records reveal a lack of consistent findings of tender trigger points on examination. *Id.* In fact, as the ALJ noted, Claimant's treatment with Dr. Serano is generally limited to complaints of headaches "about once a week or less" but no reports of extreme pain. *Id.* The ALJ noted further that Claimant's medication is limited to "various vitamin supplements, fioricet for headaches, and NSAIDs;" however, Claimant takes no muscle relaxers or narcotic pain medications. *Id.* Neither Dr. Serano's treatment records nor the MRI and nerve conduction study findings support the functional limitations suggested by Dr. Serano.

2012 WL 3647411, *6-7 (E.D.N.C., Aug. 23, 2012). As discussed, the treatment notes from Bridgeport Behavioral do not contradict, and are not inconsistent with, Salman's opinion. Moreover, treatment notes from other providers at United Summit Center and Community Mental Health Center are similar to those from Dr. Salman/Bridgeport Behavioral. Accordingly, the undersigned cannot say that the ALJ's analysis and explanation on this point are sufficient.

### i.   Activities of Daily Living

The ALJ further found Salman's opinion to be "inconsistent with . . . her activities of daily living, as noted above." (R. 23). Plaintiff argues that the ALJ never identified which of Shoulders's daily activities conflicted with Dr. Salman's opinion. (ECF No. 10 at 8). The ALJ incorporated the following, apparently, by reference:

> "[Plaintiff's] ability to drive, run errands with her daughter, shop, walk, hang out with her friend, watch television, make dinner, read a little, try to knit a blanket, attend to her personal care, do housework, shop in stores, pay bills. handle bank accounts. use a computer and play games, and read supports this determination (Exhibits SE and 8E)."

(R. 23).

A claimant's daily activities are one of the factors that the ALJ must consider in weighing the evidence. 20 C.F.R. § 416.929(c)(3)(i). However, in doing so, the ALJ must be mindful that "[a] claimant's ability to perform modest activities of daily living with some assistance is not a reason to reject [her] claims." Chandler v. Colvin, Civil Action No. 1:15-CV-214, 2017 WL 653983, *14 (N.D.W.Va. Jan. 31, 2017) (internal citations omitted). "We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." Louk v. Colvin, Civil Action No. 2:16-CV-9, 2016 WL 7383814, *22 (N.D.W.Va. Nov. 30, 2016) quoting Craft v. Astrue, 539 F.3d 668, 680 (7th Cir. 2008) (internal citation omitted).

Moreover, selectively characterizing a claimant's daily activities in a manner that makes them appear more favorable to a finding of nondisability, inconsistent with the totality of the evidence, will not suffice absent some explanation to support finding those disregarded portions of a claimant's testimony to be "incredible." Craft, 539 F.3d at 680.

The ALJ's description of Plaintiff's daily activities here is generous, to say the least, and rather selective:

> Also, while she reported that she cannot work because she does not like to be around others, she also reported that she occasionally eats out, has dated and had a boyfriend, runs errands with her daughter, shops in store, and hangs out with her friend, which appears inconsistent with an inability to be around others or interact appropriately.
> Also, while her concentration has been reported as deficient, she reported an ability to read a little, knit a blanket, drive, pay bills, handle bank accounts, and use a computer and play games, which supports some ability to focus, concentrate, and complete tasks.

(R. 23).

40

In particularly stark contrast, Plaintiff reported that she rarely talks to her friend any more. (R. 241) ("Do not talk to my friends and family as much, just want to be alone"). Plaintiff reported significant difficulty being in a relationship. (R. 240) ("Trying to have a relationship [is] very hard, [I] just go silent"), (R. 243) ("I [am] having problem[s] being with my boyfriend."). In fact, Plaintiff later reported that she and her boyfriend had broken up as a result of her difficulty interacting with others. (R. 674) ("She reports that she and her boyfriend broke up because she always 'snapped' at him."). She testified at the hearing that she can go into stores briefly but does not stay long because she has difficulty being around all of the people. (R. 60-61).[5] She reported that while she can read, she has trouble concentrating and loses her place. (R. 62). She reported being frustrated with her attempts to knit a blanket because it was taking her much longer than it should, and she had difficulty staying on task. (R. 62-63) ("I should have been done with [knitting the blanket] by now, I'm only on the third skein of yar[n] . . . [I can work on it for] about a half an hour [at one time].").

It is difficult to determine how Plaintiff's actual reports of her daily activities – fairly characterized in their totality - contradict Dr. Salman's opinion. Lewis v. Berryhill, 858 F.3d 858, n. 3 (4th Cir. 2017) (ALJ's "point[ing] to [claimant's] ability to perform incremental activities . . . [including] shop[ping] for groceries with the assistance of [others], hand[ling] her finances, and watch[ing] television" did not constitute substantial evidentiary support for concluding claimant was capable of work, noting that "Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations") (internal citation

---

[5] Q     So if you went to Walmart by yourself, would you have trouble being in Walmart?
A     I don't stay very long.
Q     Okay. And why is that?
A     Just get upset easy.
Q     Is it because of the people there?
A     Yes.

omitted)). Because the ALJ failed to fairly characterize Plaintiff's activities in the first instance, and in the second instance failed to provide explanation sufficient to permit meaningful review, that too cannot be affirmed.

In summary, the ALJ afforded the most weight to the opinions in this record that are most outdated and based on a limited amount of evidence, in contrast with the treatment notes and limited opinion of Plaintiff's longitudinal treating physician, who had seen her more recently and many more times than the consultative examiner. These notes from Plaintiff's treating specialist are generally in line with those of other treating specialists. The undersigned also observes that neither the agency reviewers nor examiner Morgan had the benefit of longitudinal evidence such as Salman's, as none of the three evaluated Plaintiff or the medical evidence more recently than 2013. The bulk of the notes from the various psychological and psychiatric specialists who treated Plaintiff occurred after that time. Under these circumstances, there is an obvious gap in the record that remains unaddressed - one that could have been easily resolved by obtaining a proper opinion from Plaintiff's treating specialist as to what he believed her relevant limitations were in each area. It is frankly unclear why this was not obtained, and the record does not appear to evidence that it was ever requested.

This is relevant because, in the absence of an opinion as to functional limitations from Dr. Salman, it is difficult to estimate precisely what effect his opinion would have if given more weight. Dr. Salman's opinion consisted of two statements: first, that Plaintiff had a disability as defined in 42 U.S.C. § 423; second, that her "physical, mental, or emotional impairment [wa]s expected to be of long-continued and indefinite duration." (R. 823). As to the first statement, it is not clear to what extent that would assist Plaintiff because that opinion "is on an issue reserved to the Commissioner:"

> **(1) *Opinions that you are disabled.*** We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

20 C.F.R. § 416.927. This includes both statements that a claimant is disabled, as well as statements that a "claimant's impairment meets the duration requirement." POMS DI 24503.040(B).[6] However, when offered by a medical source, such statements are still to be considered as "other medical evidence," even if they are not afforded "any special significance." POMS DI 24503.040(D).

Plaintiff argues that it was incumbent upon the ALJ to secure additional information if she felt the treating physician's opinion was unclear, citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("[I]f the ALJ believed that [the physician's] reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician."). Defendant does not directly address this issue, instead suggesting that Salman's opinion on these issues was biased (ECF No. 14 at 12) – an argument that the ALJ never made. However, the undersigned observes that Ferguson is distinct.

First, the Ferguson court's conclusion was based in part on the fact that the ALJ had disregarded the opinion of Ferguson's treating physician when there was *no* other medical opinions in the record. Id. at 36. The undersigned notes that the word "another" preceded "physician" in Plaintiff's quotation of Ferguson. However, here, there *were* medical opinions to the contrary in this record, from consultative examiner Morgan and the agency reviewers that the

---

[6] The Program Operations Manual System ("POMS") is "a primary source of information used by Social Security employees to process claims for Social Security benefits." The SSA publishes a public version of the POMS that is "identical to the version used by Social Security employees except that it does not include internal data entry and sensitive content instructions" at https://secure.ssa.gov/apps10/.

ALJ chose to rely on instead. This, assuming that the ALJ did so in accordance with the relevant statutes and regulations, is not impermissible standing alone.

However, "If the evidence does not support a medical source's statement on an issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the statement from the case record, the adjudicator must make every reasonable effort to recontact the source for clarification of the reasons for the statement." SSR 96-7p.; see also POMS DI 24503.040(E)(1). The undersigned was not able to locate any indication in the record that this was done.[7]

As to the ultimate question of the sufficiency of the ALJ's explanation, a similar situation was recently addressed in Thompson v. Colvin, in which the ALJ "preferred the one time examination of two consulting physicians . . . to a significant and longstanding treatment relationship of [a treating specialist]. Civil Action No. 9:13-3570-BHH, 2015 WL 1038133, *3 (D.S.C. 2015).

> Lastly, the ALJ's characterization of Dr. Khan's opinion as out of proportion to the observations of his treatment records is not sufficiently explained. Echoing the above more specific errors, the Court generally is concerned about the overall treatment of Dr. Khan's opinion vis-a-vis the entire record, including his own notes. The ALJ preferred the one time examination of two consulting physicians and the two observations of a family practice doctor to a significant and longstanding treating relationship of Dr. Khan. And, while such a preference is technically justifiable, see Morgan v. Barnhart, 142 F. App'x 716, 727 (4th Cir.2005), on the record here, it is not sufficiently explained. A couple of evidentiary examples are sufficient . . . The Court would only offer a few, illustratively. Dr. Khan continuously noted that the plaintiff had paranoia and delusional thinking, had constricted or blunted affect, had limited insight and judgment, was guarded, and was withdrawn. This evidence is potentially corroborative of Dr. Khan's later disability opinion, notwithstanding the ALJ's view that no such evidence existed. The ALJ did not go to much trouble to explain in what way he viewed this alleged and significant delta between the opinion and the contemporaneous notes. The defendant and magistrate judge were gracious to find evidence of the plaintiff's "alertness" and no "significant distress" at various places in the record. (See R & R at 9.) But, as the plaintiff counters, Dr. Khan saw the plaintiff over 60 times and only noted that she was alert on 6 of them and

---

[7] In the undersigned's experience, if a request from SSA to a medical provider for records or was unsuccessful, documentation in the record as to that fact is typically included. Here, it was not.

apparently never used the word distressed, in the way offered. The ALJ mentions the effectiveness of medications but this is such a limited observation in light of the profundity of Dr. Khan's ultimate opinion. And, taken in the context of the other concerns cited above, the undersigned finds the overall basis for discounting Dr. Khan's opinion insubstantial.

Id. (internal citations omitted).

The undersigned is of the opinion that the situation before the court now most resembles that in Thompson, the checkbox form notwithstanding, and the conclusion much the same. Had the ALJ 1) not missed key facts in the record or accurately characterized the facts cited, and 2) considered these obvious issues with the evidence and provided good reasons for siding with the agency reviewers and consultative examiner despite them, such a decision may have been able to be affirmed. However, these errors – compounded with insufficient explanation – lead the undersigned to feel that this case is best remanded to the Commissioner for reconsideration.

## 1. **RECOMMENDATION**

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge.   Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the Magistrate Judge's association with this case.

Respectfully submitted this January 16, 2018.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE